

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

**NO. 02-10-00472-CR**
**NO. 02-10-00473-CR**
**NO. 02-10-00474-CR**

ROJELIO A. TREVINO                                       APPELLANT

V.

THE STATE OF TEXAS                                              STATE

----------

FROM CRIMINAL DISTRICT COURT NO. 2 OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### Introduction

In three points, Appellant Rojelio A. Trevino appeals his three burglary convictions. We affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## Procedural Background

The State charged Appellant in separate indictments with burglarizing four habitations. Each indictment contained an enhancement paragraph alleging that Appellant had been previously convicted of two felonies. The jury found Appellant guilty of three of the four burglaries. Appellant elected to have the trial court assess punishment, and he pleaded true to the enhancement paragraphs.[2] The trial court found the enhancement paragraphs to be true and assessed Appellant's punishment at thirty-five years' confinement in each case, to run concurrently. The trial court sentenced Appellant accordingly.

## Evidentiary Sufficiency

In his three points, Appellant challenges the sufficiency of the evidence to support his three burglary convictions.

**The State's Evidence**

This appeal involves the burglaries of four homes located within a one-mile radius in South Arlington on March 11, 2010, between approximately 6:00 p.m. and 8:30 p.m. Although the jury acquitted Appellant of the fourth burglary, we discuss it to provide context to Appellant's arrest.

---

[2]Because Appellant pleaded true to the habitual offender notices alleged in each offense, his range of punishment for the second-degree burglaries was twenty-five to ninety-nine years or life. *See* Tex. Penal Code Ann. § 12.42(d) (West Supp. 2011), § 30.02(c)(2) (West 2011).

**The Allison/Johnston Burglary**

Edward Allison testified that he lived in a house with his "surrogate father" Donnie Johnston and Johnston's adopted son. On March 11, 2010, at approximately 5:30 p.m., Allison was working in his yard when he saw an individual (whom he identified later that night and at trial as Appellant) walking toward his front door. Allison went inside, and he noticed that the dogs (who always barked when someone rang the doorbell) were not barking. Allison estimated that it took Appellant "a good minute and [a] half" before he rang the doorbell. When Allison answered the door, Appellant asked if he needed any yard work done. Allison told him no, and Appellant left. Shortly thereafter, Allison left to meet Johnston at Johnston's salon.

At approximately 8:00 that evening, Allison and Johnston returned home to find that someone had entered their home without their permission and stolen some of their property—the garage door and back door were open, all the inside cabinets were open, and both Allison's and Johnston's bedrooms had been ransacked.[3] Personal items were strewn inside and outside of the house, including in the bushes around their home. An expensive bicycle and several tools were missing from the garage. Allison was also missing a black leather motorcycle jacket with a tan racing stripe down the sleeve. The front door's deadlock key was missing.

---

[3]Johnston's son remained asleep in his bedroom throughout the offense.

**The Simpson Burglary**

Matthew Simpson testified that around dusk that same day, he returned home from grocery shopping, parked his car in his garage, left the garage door open, and went inside with a load of groceries. As he returned to the garage, his dog ran out ahead of him and started barking. Simpson then "heard a noise, like somebody had dropped something" and he saw an individual (whom he identified later that evening and at trial as Appellant) standing at his tool bench. Simpson did not know Appellant and did not give him permission to enter his garage. When Simpson asked Appellant what he was doing, Appellant stated that he wanted to borrow some tools to fix his lawnmower. Then without taking any of Simpson's property, Appellant "walked away very fast."

**The Bonner Burglary**

At approximately 7:15 that same evening, Andrea Bonner pulled her car into her garage. Bonner lived alone, and as she entered her kitchen, she heard noises like someone was breaking into her home. She screamed, "Get out of my house," called 911, returned to her car, backed down the driveway, and waited for the police. When she reentered her home with the police, Bonner discovered that someone had entered her home without her permission by breaking her bathroom window. The intruder's muddy footprints went from the bathroom down the hallway to her bedroom doorway, and "you could see where there was a pivot step where he must have — maybe at the time heard the garage door and turned

4

as if to leave." The evidence indicated that the intruder exited through the front door, and the key to the front door's deadbolt was missing.

### The Johnson Burglary[4]

Scott Johnson testified that around 8:00 that same evening, he arrived home, opened his garage, and found tools and other items strewn around his garage. Inside his home, several of the doors and windows were opened and clothes were scattered all over the floor. Johnson called the police, and while waiting outside, he saw a truck pull up to a house down the street and a man jump out and run between some houses. When Arlington Police Officer Stephanie Doak arrived, Johnson told her about the suspicious activity and also that the house next door to his had been vacant for some time. While they talked, a man appeared between some nearby houses. When Officer Doak ordered the man to stop, he fled, and Officer Doak pursued. Meanwhile, Johnson discovered some of his missing personal property tossed throughout the neighborhood. Inside the vacant house, officers found a plethora of stolen items from homes in the neighborhood, including some of Johnson's property.

### The Police Investigation

Officer Doak testified that she responded to Scott Johnson's 911 call at approximately 8:20 p.m. As Officer Doak spoke with Johnson and several of his neighbors, a man came out from between some houses. When one of the

---

[4]The jury acquitted Appellant of this offense.

neighbors asked who he was, the man ran in the opposite direction. Due to the multiple reported burglaries in the area, Officer Doak pursued the suspect while identifying herself as a police officer and ordering him to stop. The suspect slowed down long enough to strip off the jacket he was wearing and then ran off among the houses. Officer Doak lost track of the suspect and radioed to other officers to set up a perimeter to search for him. Officers eventually located the suspect—later identified as Appellant—curled up under a workbench in one of the neighborhood garages. Officer Jesse Lathrop testified that the suspect in the garage matched the description of the suspect that had evaded Officer Doak. Officers Doak and Lathrop testified that Officer Lathrop arrested Appellant and that in patting down Appellant officers found several items on his person, including a folding knife, drug paraphernalia, and some jewelry. Officer Lathrop testified that Appellant also had two sets of keys in his pants pocket—two keys on a single ring marked "kitchen" and a separate single key.[5] Officer Doak testified that she subsequently went to complainant Bonner's home, and Bonner identified the separate single key as the one that had been stolen.[6]

---

[5]Officer Doak testified that in patting down Appellant, officers found several items including a set of house keys. She also testified that there was a set of house keys in the jacket Appellant had discarded as he fled.

[6]Although Officer Julianne Armendarez lifted two latent fingerprints from Bonner's front glass door, the prints did not match Appellant's known prints.

Officer John Welch testified that he responded to the 911 call regarding the burglary at Allison and Johnston's home.[7] That same evening, Officer Welch learned that officers had detained a suspect in the burglaries, and he took Allison to the suspect's location. Allison identified Appellant as the person who had come to his door a couple of hours prior to the burglary. Allison also identified the set of keys found in Appellant's pants pocket as being taken from the home. The police also returned to Allison his stolen black leather jacket, which Appellant shed during his flight from Officer Doak.

Officer Thomas McCloud testified that he responded to Officer Doak's request to establish a perimeter around the South Arlington neighborhood. Officer McCloud detained a "possible suspect"; however, when this suspect was presented to homeowner Simpson (after instructing Simpson about identification protocol), Simpson stated that the suspect was not the intruder in his garage who claimed to be borrowing tools.[8] Officer McCloud subsequently took Simpson to the location where officers were detaining Appellant, and Simpson identified Appellant with "a hundred percent" certainty as the intruder in his garage.

---

[7]Although Officer Welch lifted latent fingerprints from certain pieces of property located inside and outside the home, none of the prints were of sufficient quality to compare to Appellant's known fingerprints.

[8]That suspect was eventually arrested and charged with possession of methamphetamines.

**Appellant's Evidence**

Appellant did not testify, and he did not present a case in chief. On cross-examination, Appellant's counsel elicited from Officer Doak that one of the offense reports listed Appellant's address as "Homeless." Officer Doak further explained, however, that Appellant did not have any identification when he was arrested but that he said he lived in Haltom City. Appellant's counsel also elicited from Officer Doak that Appellant told her he "did lawn work." In his closing argument, Appellant's counsel raised the theory that Appellant had been homeless, looking for work, and merely picked up the property, not knowing it was stolen.

**Standard of Review**

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Isassi*, 330 S.W.3d at 638. The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Brown v. State*, 270 S.W.3d 564, 568 (Tex. Crim.

8

App. 2008), *cert. denied*, 129 S. Ct. 2075 (2009). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). Instead, we "determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). We must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution. *Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638. Circumstantial evidence is as probative as direct evidence in establishing an actor's guilt. *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

**Applicable Law**

A person commits a burglary if, without the effective consent of the owner, he enters a habitation and intends to commit theft, attempts to commit theft, or commits theft. *See* Tex. Penal Code. Ann. § 30.02. A suspect's identity and burglarious entry into the habitation may be proven by circumstantial evidence. *See Earls v. State*, 707 S.W.2d 82, 85 (Tex. Crim. App. 1986) (identity); *Smith v. State*, 56 S.W.3d 739, 744 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd) (identity); *see also Gilbertson v. State*, 563 S.W.2d 606, 608 (Tex. Crim. App. [Panel Op.] 1978) (entry); *Tabor v. State*, 88 S.W.3d 783, 786–87 (Tex. App.—Tyler 2002, no pet.) (entry). Unexplained or unreasonably explained possession

9

of recently stolen property by the defendant may raise an inference of guilt.[9] *See Rollerson v. State*, 227 S.W.3d 718, 725 (Tex. Crim. App. 2007); *Poncio v. State*, 185 S.W.3d 904, 905 (Tex. Crim. App. 2006); *see also Chavez v. State*, 843 S.W.2d 586, 588 (Tex. Crim. App. 1992) ("This rule of sufficiency is necessarily based upon a belief that those who steal property usually remain in possession of it for some time afterwards and that persons acquiring property honestly during such an interval are typically willing to explain how they came by it.").

**Analysis**

Regarding the Allison/Johnston and Bonner burglaries, Appellant contends that no evidence placed him inside the homes, and he emphasizes that fingerprints lifted at the scenes did not match his prints. Appellant also contends that "no evidence specifically identified [him] in possession of any of the property stolen from the house[s]."[10]

Within an approximate three-hour period, four homes within a one-mile radius were burglarized. The same night as the burglaries, Appellant was wearing (and discarded while in flight from the police) Allison's stolen leather

---

[9]Mere possession of stolen property does not create a presumption of guilt; rather, it can support an inference of guilt. *Hardesty v. State*, 656 S.W.2d 73, 76 (Tex. Crim. App. 1983). An inference is a conclusion reached by considering other facts and deducing a logical consequence from them. *Hooper*, 214 S.W.3d at 16. "[J]uries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial) . . . ." *Id.*

[10]Appellant asserts that "no evidence directly identified the jacket as the one stolen from the Johnston home" and that nothing specifically identifies the keys taken off him as the specific keys stolen from the houses.

jacket.[11]   After the police found Appellant crouched under a workbench in a neighborhood garage, homeowner Simpson identified him as the intruder in his garage earlier that evening.   Appellant also possessed house keys that both Johnston[12] and Bonner[13] identified as having been stolen from their homes.[14]

Appellant's flight from officers and unexplained possession of recently stolen property in the proximity of the burglaries supports an inference of guilt.[15]

---

[11]Allison testified that his black leather motorcycle jacket with a racing stripe on the sleeve was stolen and that the police returned it to him.

[12]Officer Welch testified that Johnston reported a missing key from "inside of the front door where they always lock the door and leave the key in its place" and that Johnston's key was recovered that night.  Officer Welch explained that "[t]here was a group of keys that was taken from the suspect and [Johnston] identified one of the keys as the one that fit in the door."  Johnston testified that the deadbolt key to his front door was stolen and that the police returned it to him.

[13]Officer Doak testified that after finding house keys on Appellant's person, she "went to one of the previous burglaries and showed her the house keys. They did belong to her."

[14]To the extent there was conflicting evidence as to whether both sets of house keys were found in Appellant's pants pocket or whether one set was found in his pants pocket and one set was found in the jacket he discarded, we must presume that the factfinder resolved any conflicting inferences in favor of the verdict and defer to that resolution.  *See Jackson*, 443 U.S. at 326, 99 S. Ct. at 2793; *Isassi*, 330 S.W.3d at 638.

[15]*See Hardesty*, 656 S.W.2d at 76 ("If a defendant is found in possession of recently stolen property and at the time of arrest fails to make a reasonable explanation showing his honest acquisition of the property, the factfinder may draw an inference of guilt."); *Clark v. State*, No. 05-07-01264-CR, 2009 WL 580868, at *2–3 (Tex. App.—Dallas Mar. 9, 2009, no pet.) (not designated for publication) ("Because he did not make his explanation at the time he was first called upon directly or circumstantially to do so, we conclude the State was not required to refute his explanation made for the first time at trial.").

*See Poncio*, 185 S.W.3d at 905 ("Appellant's exclusive and unexplained possession of property recently stolen in a burglary in conjunction with the fact that he pawned the property very close to the burgled home are sufficient to support his burglary of a habitation conviction."); *see also Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (holding that flight can give rise to an inference of guilt). The reasonableness of the explanation given by Appellant's counsel at trial—that Appellant found the property—was a fact issue the jury resolved against him. *See generally Havard v. State*, 972 S.W.2d 200, 203 (Tex. App.—Beaumont 1998, no pet.). Despite the lack of fingerprint evidence, the evidence supports Appellant's burglary convictions in these two cases. *See Rollerson*, 227 S.W.3d at 725 (holding that the defendant's possession of items recently stolen in a burglary was legally sufficient evidence to convict him of the burglary, even though there were no witnesses); *see also Rogers v. State*, 929 S.W.2d 103, 108 (Tex. App.—Beaumont 1996, no pet.) (sustaining burglary conviction despite the lack of physical evidence, including fingerprints, linking the appellant to the burglary of a habitation); *Lemons v. State*, No. 02-10-00301-CR, 2011 WL 3795266, at *5–6 (Tex. App.—Fort Worth Aug. 25, 2011, no pet.) (mem. op., not designated for publication) (upholding appellant's burglary conviction in part because the police found recently stolen property in his pockets).

Regarding the Simpson burglary, Appellant asserts that the State failed to prove both (1) that he entered a "habitation," because the evidence established

that he entered Simpson's garage (which Simpson never described as being attached to his home) and (2) that he intended to steal the tools because the evidence established only that he intended to borrow them. A "habitation,"[16] however, includes "each separately secured or occupied portion of the structure" and "each structure appurtenant to or connected with the structure." Tex. Penal Code Ann. 30.01(1)(A), (B). Courts have construed these definitions to include both attached and unattached garages. *See Darby v. State*, 960 S.W.2d 370, 371–72 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd) (holding that under burglary statute an unattached garage is a "structure appurtenant to" a residence); *Johnson v. State*, 844 S.W.2d 872, 874 (Tex. App.—Amarillo 1992, no pet.) (rejecting contention that garage attached to house did not constitute habitation). Moreover, in a burglary prosecution, the specific intent to commit theft may be inferred from the circumstances. *See McGee v. State*, 774 S.W.2d 229, 234 (Tex. Crim. App. 1989), *cert. denied*, 494 U.S. 1060 (1990); *Goodeaux v. State*, 269 S.W.3d 730, 734 (Tex. App.—Beaumont 2008, no pet.). Here, the jury could reasonably find that Appellant intended to commit theft when he entered Simpson's garage without Simpson's permission at nightfall and then departed quickly when his efforts were thwarted by Simpson and his dog.[17] *See*

---

[16]"'Habitation' means a structure or vehicle that is adapted for the overnight accommodation of persons . . . ." Tex. Penal Code Ann. § 30.01(1) West 2011.

[17]Simpson testified that he found Appellant in his garage at "dusk, I think. But by the time he walked away it . . . already had gotten dark."

13

*Brown v. State*, 122 S.W.3d 794, 800 (Tex. Crim. App. 2003) ("[T]he presumption of an intent to commit theft arises from the nonconsensual nighttime entry of a home or building."), *cert. denied*, 541 U.S. 938 (2004); *see also McMillian v. State*, 873 S.W.2d 62, 64 (Tex. App.—Tyler 1993, pet. ref'd) (holding that circumstantial evidence of entry included defendant's hasty retreat in car from burglary scene).

Viewing all of the evidence in the light most favorable to the jury's verdicts, and deferring to the jury's authority to draw reasonable inferences from basic facts to ultimate facts, we conclude that the evidence was sufficient to enable the jury to rationally find, beyond a reasonable doubt, that Appellant committed each of the three burglaries. We overrule Appellant's three points.

### Conclusion

Having overruled Appellant's three points, we affirm the trial court's judgments.

ANNE GARDNER
JUSTICE

PANEL: GARDNER, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: June 28, 2012